OMAHA PAPER STOCK COMPANY, APPELLEE AND CROSS-APPELLANT, V. CALIFORNIA UNION INSURANCE COMPANY, APPELLANT AND CROSS-APPELLEE.

262 N. W. 2d 175

Filed February 8, 1978. No. 41109.

32

William J. Brennan, Jr., and C. L. Robinson of Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, for appellant.

Abrahams, Kaslow & Cassman, for appellee.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, and WHITE, JJ.

WHITE, C. THOMAS, J.

Omaha Paper Stock Company, plaintiff and appellee herein, initiated this action to recover on an insurance contract issued by the defendant insurer. Claiming an actual loss of $347,525, the plaintiff attempted to recover the $250,000 policy limit. Trial by jury was waived. The District Court entered judgment in favor of plaintiff in the amount of $121,806.25. The sum of $102,000 of this amount was to cover the actual cash value of the inventory lost, while the remaining $19,806.25 was the cost of removal of damaged inventory. Plaintiff was also awarded attorney's fees in the amount of $21,000. Defendant appeals to this court contending that plaintiff is not entitled to recover under the policy due to plaintiff's fraudulent misrepresentations both in the proof of loss submitted to the defendant and in false testimony during discovery. Defendant also contends the trial court erred in its determination of the amount of damages and its awarding of attorney's fees. Plaintiff cross-appeals contending the judgment should have been the maximum amount allowable under the policy, $250,000.

Plaintiff operates two plants in Omaha where reusable wastepaper is processed and marketed. Plaintiff has been engaged in this business for over 55 years. Paper is collected by plaintiff or brought to the plant for processing, which processing consists of sorting the paper according to various grades and then running it through a machine which assembles it into baled form. The baled paper is then sold to mills.

Following an all-time high in demand and price in 1973 and early 1974, the wastepaper market began a sharp decline in 1974. As the market price declined, the number of processors and brokers competing for the paper declined, resulting in the availability of greater volumes of wastepaper at reduced prices. Plaintiff, believing the depressed market conditions were temporary, began to stockpile large quantities of baled paper in inventory outside its plant, known as the Roundhouse. To process the increased volume of incoming paper, the plaintiff employed an additional shift of employees from October 1974 to January 1975.

On February 13, 1975, defendant issued its fire insurance policy insuring the plaintiff's outside inventory of baled paper against loss in the amount of $250,000. A fire occurred at the Roundhouse plant on April 20, 1975, which fire substantially destroyed the company's outside inventory. Following the fire, both the plaintiff and defendant hired public adjusters to evaluate the loss. Removal of the damaged paper bales that remained was necessary because they continued to smolder for weeks and were a potential fire hazard. Defendant did not advise the plaintiff on what steps should be taken to dispose of these bales despite plaintiff's request for assistance in this matter. On June 17, 1975, plaintiff notified the defendant that it was commencing to dispose of the paper. The burial of the paper was completed on July 30, 1975.

The plaintiff submitted a timely proof of loss to the defendant on June 18, 1975. At that time, the total of the damages submitted was $394,725. The actual cash value of the property was stated to be $347,525. Plaintiff's itemization of the property included the four grades of paper destroyed, the total tons of each grade, and the cost per ton. The remainder of the damages was to be the cost of removing the paper. The defendant rejected this proof of loss on the general ground that loss had not been demonstrated according to the policy requirements.

Plaintiff submitted a supplemental proof of loss on July 15, 1975. The total loss figure was reduced because of the decision to bury the paper rather than remove it; however, the value of the property remained the same. The plaintiff also included general statements as to ownership and the nonexistence of any other insurance contracts covering the same property. On July 21, 1975, the defendant rejected this proof of loss stating that: "The insured has not complied with *Requirements in the Event of Loss,* lines 84 through 116 of the policy * * *." Lines 84 through 116 list a broad range of requirements concerning notice of loss, itemizations of value, ownership, and discovery by the defendant. The defendant did not mention a particular requirement in its rejection.

Defendant's principal contention is that the proofs of loss greatly exaggerated the quantity and quality of inventory and that the plaintiff made false statements as to plaintiff's method of record keeping. A ledger book containing a weekly compilation of plaintiff's inventory formed the basis for the tonnage figures contained in the proofs of loss. As such, the book was plaintiff's principal record to support its loss. Other company records could not establish the quantity of paper that existed as inventory since continuing decline of market conditions enabled the plaintiff to obtain paper from its suppliers without

payment.   Correspondingly, no invoices were pre-
pared for such transactions and no record entries
were made.   At trial, the ledger book was received
as evidence for the limited purpose of showing what
had been presented to defendant.

Testimony surrounding the method of attaining
the figures found in the ledger book, and the time of
their transcription, form the basis of defendant's
argument of material misrepresentation. Robert Ep-
stein, president of plaintiff company, was asked
about the production records kept by the plaintiff. In
a sworn statement taken on August 19, 1975, he re-
sponded that:   "The manager, during the time that
this inventory was accumulated from October 1
through April 20th, kept track, bale by bale, of what
he stored out in the yard.   At the end of the week,
this figure was handed into the office."   Epstein was
then asked by his attorney to whom the figure was
handed.   He responded the figure was handed:   "To
Wilma Pedersen, and was written in a journal on a
weekly basis, in tons, of the net inventory that was
kept in the yard.   The balance of the production
would be sales."   Wilma Pedersen is plaintiff's
bookkeeper.   Essentially, the same response was
given in the answers to interrogatories filed on Feb-
ruary 26, 1976.

Plaintiff then filed a supplemental answer to the
interrogatories which stated the baler operator kept
a record of the number of bales processed daily on a
record form located adjacent to the baler.   Each
week the sheet was given to the plant manager, who
then computed the actual number of bales placed in
inventory by subtracting the bales shipped and add-
ing bales delivered in baled form and placed in in-
ventory.   The plant manager then conveyed this in-
formation to Epstein, usually on a weekly basis.
Epstein, in turn, listed the number and grade of
bales on a yellow pad in his office.   It was only after
the fire that the yellow pad notes were handed to

Wilma Pedersen who then entered the figures by week in the ledger book at issue.

At trial, Robert Conant, plaintiff's public adjuster, testified that he was responsible for the existence of the ledger book. He identified the book as a "recap of the notes that Mr. Epstein or his office had from calling in. In other words, I advised Mr. Epstein to recap it in a presentable form so that I could submit it to Mr. Morgan" (defendant's adjuster). Mr. Conant said he knew from the very beginning that the ledger book was prepared all at one time and had informed Morgan, defendant's adjuster, of the fact.

Plaintiff contends that the supplemental answer to interrogatories was made to clarify an ambiguity in the initial testimony concerning the ledger book. We cannot subscribe to plaintiff's argument. The initial statements of Epstein in the depositions and interrogatories convey the inescapable impression that entries in the ledger book were made each week by Wilma Pedersen before the fire. When contrasted to the later admission of Epstein, his initial statements are clearly a misrepresentation of fact.

A clause in the insurance policy issued by the defendant to plaintiff reads: "This entire policy shall be void if, whether before or after a loss, the insured has willfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto." The insurance policy, as well as the statements of Epstein in the depositions and interrogatories, were in evidence. The defendant contends that it is probable the trial court found the statements were misrepresentations, but did not hold the policy to be voided by such misrepresentations because it failed to correctly apply the law. We disagree with the defendant. While we certainly do not condone the action of the plaintiff's agent, we cannot find, under the law as applied to

the facts of this case, that such conduct was so significant in nature as to void plaintiff's recovery.

Firemen's Ins. Co. of Newark v. Smith, 180 F. 2d 371, was an action to recover on a fire insurance policy. The insurance company contended that the policy was void because of the false swearing by the insured in the proof of loss and in depositions. The court held that following such an assertion the issue becomes "whether the alleged false swearing by the insured related to any material fact or circumstance concerning the insurance or the subject thereof." The court held that the insured's repeated statements that the destroyed premises were used only as a residence and restaurant, when, in fact, they were also used for public drinking and gambling, were immaterial to the insurer's risk or the loss.

In Nebraska, reliance and resulting injury are essential elements of materiality. This court held in Havlik v. St. Paul Fire & Marine Ins. Co., 87 Neb. 427, 127 N. W. 248: "Many authorities hold that false statements in the proof of loss will forfeit the policy, whether or not the company is in any way injured by such statement, but a contrary rule has been established in this state. Unless such false statements affect the risk they are not cause for declaring the policy void. Springfield Fire & Marine Ins. Co. v. Winn, 27 Neb. 649 (43 N. W. 401). It follows from this principle that it must appear that the defendant acted upon such false statements, or was in some manner prejudiced or affected by them."

While we are concerned here with a misrepresentation in a supporting record rather than in the proof of loss, the same standard applies. Defendant neither relied on nor was prejudiced by plaintiff's misrepresentations. The evidence shows defendant rejected both proofs of loss. There is no evidence that defendant was influenced in any way by the ledger book, whether it be an ongoing business record or not. The ledger book was introduced at trial only

for the limited purpose of showing what plaintiff presented to defendant.

Defendant's second assignment of error is related to the first in that it is alleged the trial court erred in failing to determine that the proofs of loss were knowingly false and fraudulent. The trial court could have found from the substantial amount of conflicting evidence that the figures in the proofs of loss were not false and fraudulent. The statements of Epstein which we have found to be misrepresentations are limited to the time and manner of compilation of the ledger book. These misrepresentations do not, in and of themselves, make the proofs of loss fraudulent misrepresentations as defendant contends. The central issue at trial was the determination of the amount and value of paper destroyed. The record does not show any singular piece of conclusive evidence on those issues. An examination of the record does not disclose that plaintiff submitted knowingly false figures in his proofs of loss.

What the record does show is that the attitude and attendant conduct of the defendant were not conducive to establishing conclusive evidence that the proofs of loss were fraudulent. The remains of the baled paper stayed at plaintiff's plant over 3 months. During this time the defendant made no attempt to examine the remains to possibly ascertain the amount of paper burned. The defendant contends it did not attempt to physically verify the inventory since such a task would be futile. However, one of defendant's expert witnesses, Donald Wandling, a mechanical engineer, testified that it would have been easier to compute total tonnage while the product was still on the ground. When one in possession of any right secured by contract does something inconsistent with the existence of his right or with his intention to rely upon it, he is precluded from afterwards claiming anything by reason of it. Jensen v. Palatine Ins. Co., 81 Neb. 523, 116 N. W. 286.

Defendant relies primarily on Home Ins. Co. of New York v. J. W. Winn & Co., 42 Neb. 331, 60 N. W. 575, and Homes Ins. Co. v. Hardin (Ky. App.), 528 S. W. 2d 723. In Home Ins. Co. of New York v. J. W. Winn & Co., *supra*, the insured admitted at trial that he knowingly and deliberately altered his records to show the substantially exaggerated inventory reflected in the proof of loss. In Home Ins. Co. v. Hardin, *supra*, the insured had moved to another home with most of his furnishings before a fire destroyed his former home. It was undisputed that the insured claimed on the proof of loss a number of items which had been moved before the fire. These cases are distinguishable from the present case. In each of these cases, the evidence before the court on appeal had clearly established that the proofs of loss were fraudulent.

In the present case we have a disputed question of fact as to quality and quantity. Existence of fraud or false swearing with respect to fire loss represented to insurer to have been sustained is for the trier of facts. See Joseph Supornick & Son, Inc. v. Imperial Assur. Co. of New York, 87 F. Supp. 232, affirmed 184 F. 2d 930. The judgment of a trial court in an action at law where a jury has been waived has the effect of a jury verdict and will not be set aside on appeal unless clearly wrong. See Mickelson & Mickelson Hay Contractors v. Christensen, 197 Neb. 34, 246 N. W. 2d 655. We cannot say under the facts and evidence that the trial judge was clearly wrong. Even if defendant proved the proofs of loss contained fraudulent misrepresentations, there would still remain the issue of reliance which we discussed earlier.

The third assignment is that the trial court erred in determining the amount of damages. The difficulty of ascertaining the value of the loss is readily apparent from the evidence. As has been noted, the quantity of paper on hand could not be determined

from company records. The plaintiff attempted to establish quantity by several other methods. The plant manager testified he took a physical inventory each month. Based upon his own observations, he testified there were approximately 17,000 tons of baled paper in outside storage on April 20, 1975. Of this amount he estimated one-half was corrugated; and news, doubleline, and mixed comprised one-sixth each of the remaining amount.

Sorensen Construction Company, the firm which buried the paper, kept a daily count of the number of bales buried. Using the figure 1,700 pounds for large bales (those baled by plaintiff) and 700 pounds for small bales (those baled by suppliers), it was estimated there had been 15,584 tons of paper. Plaintiff hired the engineering firm of Lamp, Rynearson & Associates, Inc., to survey the area where the paper had been stored. Using information supplied by plaintiff, the firm computed there were 15,568.28 tons of paper prior to the fire.

The defendant disputed the accuracy of the information supplied by plaintiff as well as maintaining the number of bales could not be determined with any accuracy. The mechanical engineer called by defendant testified that he estimated only 2,407.31 tons of paper could have been buried in the trenches as they were described and with a post-burial elevation of 4 feet. This witness also attempted to compute the potential output of plaintiff's baling machine. Assuming the baler operated at 75 percent efficiency on an 8-hour day, 5½ days per week, from October 1, 1974, to April 20, 1975, he estimated only 11,399.4 tons of product could have been produced. Plaintiff's plant manager testified the baler had a greater output and evidence was introduced that a second shift was employed until January 1975.

Richard Hanousek, who had 10 years experience as a scrap-paper dealer, testified for defendant. Basing his testimony on an examination of plaintiff's

sales records for a period of 7 months before and after October 1, 1974, he stated plaintiff could have only had 9,322 tons of product at the time of the fire. Plaintiff claims such a computation is inaccurate since it does not account for increased production after October 1, 1974.

Plaintiff and defendant both called certified public accountants. Defendant's accountant challenged the average bale weights based on his examination of several invoices. Plaintiff's accountant substantiated the weights.

Plaintiff's witness, Robert Mendelson, a paper broker and mill owner, testified that there always has been a market for wastepaper and there was one in April 1975. Paper mill market prices, F.O.B. dealer's plant, are quoted in the "Official Board Markets," "The Yellow Sheet." For the week ending April 26, 1975, the prices per ton in the Chicago or Midwest area were as follows:

| Mixed | $ 5 - $ 10 |
| News | 18 - 25 |
| Corrugated | 15 - 20 |
| Doubleline | 22 - 30 |

Plaintiff also introduced evidence of its own sales during the months of March and April 1975.

Defendant alleges the paper had no value because of the depressed state of the market. Several letters were written by plaintiff to its suppliers in which it was stated there was no market for the paper and that plaintiff would not pay for any paper it collected. Also, one of defendant's expert witnesses, Richard Hanousek, stated that in his opinion an inventory of 16,000 tons of paper would have no market value.

There was sufficient evidence from which the trial court could conclude that plaintiff was entitled to compensation for a loss under the terms of the insurance policy. It is not within the province of the Supreme Court to resolve conflicts in or to weigh evi-

dence and it will be presumed that controverted facts were decided by the trial court in favor of the successful party. See Lewis v. Hiskey, 166 Neb. 402, 89 N. W. 2d 132. The finding of the trial court as to damages was within the range of evidence. Where it has been proven that damage has resulted and the only uncertainty is the exact amount, it is sufficient if there is evidence from which the amount of the damages can be ascertained with reasonable certainty. See Roberts Constr. Co. v. State, 172 Neb. 819, 111 N. W. 2d 767. The rule is not peculiar to cases against insurance companies. In all cases the law requires, not mathematical certainty, but merely the best evidence obtainable under the conditions existing, and some reliance must be placed upon the integrity and good faith of witnesses and the discretion of the jury. See Jensen v. Palatine Ins. Co., *supra*. We find no error in the trial court's determination as to the amount of recovery awarded.

Defendant's fourth assignment of error is directed to the trial court's awarding to plaintiff attorney's fees in the amount of $21,000. Under section 44-359, R. R. S. 1943, in an action where a plaintiff prevails against an insurance company: "* * * the court, * * * shall allow the plaintiff a reasonable sum as an attorney's fee in addition to the amount of his recovery, * * *. If such cause is appealed, the appellate court shall likewise allow a reasonable sum as an attorney's fee for the appellate proceedings; * * *." This litigation involved a substantial amount of time and work. The plaintiff's attorney substantiated his time through records showing the amount of hours spent on the case. We cannot say the amount awarded was unreasonable. The amount of an award of an attorney's fee is largely within the discretion of the trial court. While trial courts and appellate courts equally are regarded as experts on the value of legal services, a trial court ordinarily has a better opportunity for practically appraising the sit-

uation, and an appellate court will interfere only to correct a patent injustice, where the allowance is clearly excessive, or insufficient. Junker v. Junker, 188 Neb. 555, 198 N. W. 2d 189.

On cross-appeal, the plaintiff alleges that it is entitled to receive the $250,000 policy limit since the conduct of the defendant, in failing to inspect the damaged inventory, constitutes estoppel and the defendant is thereby foreclosed from challenging the quantity of inventory. Plaintiff bases his claim on the doctrine of equitable estoppel. The essential elements of equitable estoppel are: As to the party estopped, " * * * (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts." As to the other party, " * * * (4) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (5) reliance in good faith, upon the conduct or statements of the party to be estopped; and (6) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his injury, detriment, or prejudice." Pester v. American Family Mut. Ins. Co., 186 Neb. 793, 186 N. W. 2d 711.

In Pester, this court held that nonpayment of a periodic premium would not bar recovery by the insured in the absence of notice by the insurer that the premium was due. The evidence showed that the insurer had given such notice in the past, although it was not required to do so, and the insured had come to rely on such notices. Plaintiff also cites additional cases from this jurisdiction to support his proposition. In each of these cases the insurance

company notified the insured that it was rejecting its claim for a particular reason. When the matters came to trial, the insurance companies then asserted different grounds for their denials of recovery. This court held that the insurer is estopped from raising the issue at trial. See, From v. General American Life Ins. Co., 132 Neb. 731, 273 N. W. 36; Hamblin v. Equitable Life Assurance Society, 124 Neb. 841, 248 N. W. 397; Yates v. New England Mutual Life Ins. Co., 117 Neb. 265, 220 N. W. 285.

This court's application of the estoppel doctrine in the above cases was in situations clearly distinguishable from the present one. An affirmative act or actions constituting estoppel were involved in the above cases. Here, the defendant neither misled the plaintiff through a course of conduct conducive to reliance nor raised a differing reason for its denial of proof of loss at trial than in its initial contacts with insured. The defendant did not attribute to a particular reason its initial denial of proof of loss. We are concerned with the single event of defendant's failure to inspect the damaged inventory.

We have voiced earlier our disapproval of defendant's conduct. While we feel inspection may have facilitated adjustment of the claim and added weight to the evidence defendant presented in support of its contention of an exaggerated and fraudulent claim, we cannot say that it should constitute an estoppel to any challenge of plaintiff's claim. The evidence does not show that if the defendant had attempted to make calculations after inspecting the premises it would have established conclusive proof of quantity. It may have been helpful, but not decisive. Defendant's action affects only the strength of its argument as to the fraudulent claim and not the proof of the claim. There is also no evidence of reliance by the plaintiff on defendant's failure to act. Equitable estoppel operates where a party is held to a representation made or position assumed, where otherwise

inequitable consequences would result to another who, having the right to do so under all the circumstances of the case, has in good faith relied thereon. See May v. City of Kearney, 145 Neb. 475, 17 N. W. 2d 448.

The judgment of the trial court is affirmed with $3,000 attorney's fees allowed to plaintiff on this appeal.

AFFIRMED.