DALE ELECTRONICS, INC., APPELLEE, V. FEDERAL
INSURANCE COMPANY, A CORPORATION, APPELLANT.
286 N. W. 2d 437
Filed December 18, 1979.   No. 42441.

Bruce D. Vosburg and Lyle E. Strom of Fitz-
gerald, Brown, Leahy, Strom, Schorr & Barmettler,
for appellant.

James J. Holmberg (Columbus) and George A.
Padgett, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN,
CLINTON, BRODKEY, and HASTINGS, JJ.

KRIVOSHA, C. J.
The appellant herein, Federal Insurance Company

(Federal), appeals from a judgment in favor of Dale Electronics, Inc. (Dale) in the amount of $242,265.53, plus prejudgment interest of $54,119.59 and attorney's fees of $39,560 and other costs of $15,453.14, entered by the trial court sitting in place of a jury. The principal issues raised by the appeal are whether at the time of the crash in question there was coverage under the policy issued by Federal to Dale, and whether the awarding of attorney's fees and costs in the amounts allowed was appropriate. For reasons more particularly set out herein, we find that the conclusion of the trial court sitting as a jury to the effect that there was coverage at the time of the accident involved herein was correct, but that the awarding of the amount of attorney's fees and costs was excessive and should be modified. For that reason the judgment of the trial court is affirmed in part and in part modified.

On January 31, 1975, an airplane owned by Dale and identified as N399T crashed while landing at the Executive-Johnson County Airport (EJCA), just south of Kansas City in Olathe, Kansas. It was daylight at the time of the crash and the plane was being flown by Dale's employee pilot. He was alone at the time of the fatal crash, and it is admitted there was no copilot aboard the plane. It was agreed by the parties that at the time of the fatal crash weather conditions at EJCA consisted of a 400-foot ceiling and 1-mile visibility.

At approximately 1:32 p.m., CST, the pilot, then being about 7 miles from EJCA and at an altitude of 2,600 feet, received final turn and approach clearance from the Kansas City approach control. At approximately 1:33 p.m., CST, the pilot contacted EJCA's tower via radio and was given clearance to land.

Shortly prior to the time of the accident the air traffic controller saw the plane break out of the overcast at approximately 400 or 500 feet over the

Very High Frequency Omni Directional Range Station located at the south, or approach, end of runway 35 of EJCA. The plane proceeded to descend at a level attitude, turning slightly to the right, and then approximately 30 or 40 degrees right, continuing down until it crashed, killing the pilot.

The accident resulted in the total loss of the plane, except for its salvage value. The stated insured value of the plane was $250,000. Dale received $10,000 for the plane's salvage value and incurred costs of $2,265.53 to protect the plane as required under the terms of the policy.

The record reflects that the plane left Oklahoma City on the day of the crash at approximately 12:22 p.m., CST. The Dale flight log for the plane, dated January 31, 1975, showed that after stopping at EJCA the pilot planned to continue on to his final destination at Columbus, Nebraska, the home base of Dale and the airport at which the plane was kept when not otherwise in flight. The pilot had flown from Columbus, Nebraska, to Oklahoma City on January 28, 1975, for routine maintenance.

The record further reflects that the pilot had been contacted early in the day on January 31, 1975, by a Mr. Ira Gates, Dale's vice president of sales and marketing. Mr. Gates was in the Kansas City area visiting a manufacturer's sales representative of Dale at his residence in Johnson County, Kansas. The sales representative was having some difficulty with alcohol, and Mr. Gates was trying to persuade him to be admitted to an alcoholic rehabilitation center located in Kansas. Mr. Gates had asked the pilot, who was a personal friend of the sales representative, if he might not stop at Olathe, Kansas, on his return flight to Columbus, Nebraska, so that they might discuss the sales representative's situation and see if the pilot might be able to convince him that he should have himself admitted for treatment.

Following the fatal crash, Federal denied cover-

age on the basis that the terms of the policy had not been met. The face of the policy provided in part as follows: "Item 5. Pilots. The coverage afforded by this policy shall not apply while the aircraft is operated in flight by other than the following pilots: Any person having a certificate from the Federal Aviation Administration designating him a commercial pilot, airplane category with multi-engine land and instrument ratings and who has a minimum of 2,500 total logged flying hours, including at least 750 hours as pilot in command of multi-engine aircraft. *And see Endorsement No. 5.*" (Emphasis supplied.) No issue was raised about the pilot's qualifications as called for by the policy.

Endorsement No. 5 was a typewritten endorsement attached to the policy and contained a number of specific terms and conditions apparently negotiated between Federal and Dale. In any event, they were not part of Federal's standard policy of insurance and were contained in a specific typewritten document. Item 4 of endorsement 5 related to several specific airplanes, including N399T. Subparagraph C of item 4 of endorsement 5 amended item 5 of the policy to require a two-man crew consisting of a captain and a copilot in the operation of the covered aircraft. Subparagraph D of item 4 of endorsement 5 provided as follows: "D. Item 5- Pilots of the Declarations is extended to include the following: Only while the aircraft is operated under daylight Visual Flight Rules conditions for the purpose of maintenance or Ferry Flights, the requirement for a co-pilot shall not apply." Federal maintained that at the time of the crash the plane was not being operated for either a maintenance or ferry flight and further that it was not then being operated under daylight Visual Flight Rules conditions. The trial court in rendering a judgment for Dale and against Federal obviously held to the contrary.

Before proceeding to make an investigation of the

trial court's judgment, it might be well to review certain basic principles by which this court reviews a determination of a trial court sitting without a jury in a law action. We have frequently said that the decision of a trial judge has the effect of a jury verdict and will not be set aside or disturbed on appeal unless it is clearly wrong. Weiss v. Union Ins. Co., 202 Neb. 469, 276 N. W. 2d 88; Omaha Paper Stock Co. v. California Union Ins. Co., 200 Neb. 31, 262 N. W. 2d 175. Furthermore, we have said that in determining the sufficiency of the evidence to sustain a judgment, that evidence is required to be considered most favorably to the successful party. Each controverted fact must be resolved in favor of that party and the successful party is entitled to the benefit of any inferences reasonably deducible from the evidence. Weiss v. Union Ins. Co., *supra*; Burgess v. Curly Olney's, Inc., 198 Neb. 153, 251 N. W. 2d 888; McBride v. Fort Kearney Hotel, Inc., 185 Neb. 518, 176 N. W. 2d 911. Unless we can say as a matter of law that the decision of the trial court sitting as a jury was clearly wrong and not supported by the evidence viewed most favorably to Dale, we are obligated to affirm the decision of the trial court even though had we been sitting as the trier of fact we might have decided otherwise.

Unfortunately, neither the phrase "maintenance or ferry flights" nor "daylight Visual Flight Rules conditions" as used in the policy is defined in the policy. While each party maintains that the language is clear, their disagreement as to the "clear meaning" of the policy makes it apparent that there is a difference of opinion and that the language is not all so clear. We are therefore required in reviewing this matter to keep certain basic rules of interpretation in mind. Insurance contracts will be interpreted in accordance with the reasonable expectations of the insured at the time of the contract, and a reasonable construction should

be given so as to effectuate the purpose for which it was made. In cases of doubt, the policy is to be liberally construed in favor of the insured. Modern Sounds & Systems, Inc. v. Federated Mut. Ins. Co., 200 Neb. 46, 262 N. W. 2d 183; Neal v. St. Paul Fire & Marine Ins. Co., 197 Neb. 718, 250 N. W. 2d 648; Shipley v. American Standard Ins. Co., 183 Neb. 109, 158 N. W. 2d 238.

Where an insurance contract is reasonably susceptible to two or more interpretations, the one most favorable to the insured will be adopted. Townley v. Whetstone, 190 Neb. 541, 209 N. W. 2d 350; American Standard Ins. Co. v. Tournor, 186 Neb. 585, 185 N. W. 2d 267; Waak v. National Bankers Life Ins. Co., 180 Neb. 129, 141 N. W. 2d 454; Lonsdale v. Union Ins. Co., 167 Neb. 56, 91 N. W. 2d 245. If the language used in an insurance policy is ambiguous, it should be construed most strictly against the insurance company which is responsible for the language. Niemeyer v. Estate of Tichota, 191 Neb. 484, 215 N. W. 2d 885. With these various rules of construction in mind we turn first to the question of whether at the time of the fatal crash the plane was being operated for the purpose of a maintenance or ferry flight.

It is undisputed that the plane had been earlier taken to Oklahoma City, Oklahoma, for routine maintenance and, but for the stopover at EJCA, was being returned to Columbus, Nebraska, its home base. The more direct question then is whether the intended stopover at EJCA during the return flight from Oklahoma City, Oklahoma, to Columbus, Nebraska, destroyed the ferry flight nature of the trip.

As we have previously noted, the policy did not define "ferry flight" nor designate how the term was to be interpreted. It is by its very nature a term uniquely related to the flying of aircraft and not a word of common parlance.

Dale maintained that the term was an industry-

defined term and offered as evidence of its meaning both the testimony of an expert witness and the Airman's Information Manual, Part I, Basic Flight Manual and ATC Procedures (1977), published by the U. S. Department of Transportation, Federal Aviation Administration.

The manual defines "ferry flight" to mean: "A flight for the purpose of: (1) returning an aircraft to base; (2) delivering an aircraft from one location to another; or (3) moving an aircraft to and from a maintenance base." As earlier noted, but for the planned stopover at EJCA, the flight from Oklahoma City, Oklahoma, to Columbus, Nebraska, was a ferry flight covered by the policy and required only one pilot on board.

Federal argues, however, that the pilot was flying to EJCA for the sole purpose of taking the sales representative to an alcoholic rehabilitation center.

A jury sitting as reasonable people, and in this case the trial court sitting in place of the jury, could reasonably find from the evidence that the pilot was returning the plane to its base in Columbus, Nebraska, and was therefore on a ferry flight. The momentary stopping at EJCA did not change that purpose. There was no evidence introduced that following the arrival of the plane at EJCA, the sales representative would board and the pilot would fly to Norton, Kansas, or anywhere else except Columbus, Nebraska. It was not unreasonable for the trial court to conclude that indeed the pilot intended to continue on to Columbus, Nebraska, after his brief stopover at EJCA. We cannot say as a matter of law that the evidence does not support the trial court's conclusion insofar as it must have determined that the purpose of the ill-fated flight was for ferry purposes. Applying the rules of construction earlier set out in this opinion as we are required to do, we must affirm the trial court's conclusion in that regard.

Having reached that result, we must next examine the record to see if there is sufficient evidence upon which the trial court could reasonably find that at the time of the crash the plane was then being operated under Visual Flight Rules *conditions*. In this regard it is necessary that we recognize a distinction between operating a plane under Visual Flight Rules (VFR) themselves and simply operating a plane under Visual Flight Rules "conditions." The former require absolute compliance while the latter only require the existence of certain weather *conditions*. For purposes of this case, the distinction is significant.

Dale offered, without objection, the testimony of several expert witnesses to the effect that at the time of the crash the pilot was operating the plane under VFR conditions, to wit: a 400-foot ceiling and 1-mile visibility. Federal argues that the conclusion is wrong because first, a 400-foot ceiling and 1-mile visibility is a "special VFR" and not VFR, and second, the pilot had not obtained a clearance from the air tower controller to land under a special VFR. The difficulty with this argument is due to Federal's unwillingness to recognize the fact that the policy does not specify which VFR conditions are to apply and that it is only VFR *conditions* which are required to be met.

Both parties seem to agree that the meaning of VFR conditions required in the policy must be found by examining the appropriate section of Title 14, Code of Federal Regulations, entitled Special Federal Aviation Regulations. The appropriate sections are 91.105, 91.107, and 91.109. All three sections are grouped together under a general heading entitled Visual Flight Rules. Section 91.105 is entitled *Basic* VFR *weather* minimums; section 91.107 is entitled *Special* VFR *weather* minimums; and section 91.109 is entitled VFR cruising altitude or flight level and appears not to be involved in this matter. The gen-

eral heading of Visual Flight Rules therefore consists of two subparts, one "basic" and one "special," both of which are nevertheless Visual Flight Rules.

What language in the policy or what rule of construction requires us to read the term "Visual Flight Rules" of the policy to mean "basic" and not to also mean "special?" Nothing to support that position has been cited to us and we know of no rule of construction which would require it. Quite to the contrary, we are compelled to hold that both "basic" and "special" are included in the policy term "Visual Flight Rules" just as they are both included in the federal regulations.

Federal further argues, however, that even if the special VFR applies, the pilot was not operating the plane under such conditions because he had not received an appropriate clearance from the air traffic controller. Dale, on the other hand, maintains that the policy language refers to "weather conditions" and not strict flight operations. The trial court obviously agreed with Dale on that point and again we cannot say as a matter of law that the trial court was wrong. Sections 91.105 and 91.107 specifically provide in their titles that they are "weather minimums." Substituting the title to section 91.107 for the policy language would give us the following: "Only while the aircraft is operated under daylight Special Visual Flight Rules weather minimums conditions * * *." The evidence was to the effect that the plane was at the time of the crash operating free of clouds at least 400 feet from the ground and with 1 mile of visibility. The existence of conditions equal to 400 feet with regard to clouds and 1 mile with regard to visibility meets "Special Visual Flight Rules weather minimums conditions" and is within the policy requirements. We again cannot say as a matter of law that the trial court was clearly wrong. That being the case, we must affirm the findings of fact made by the trial court and therefore affirm the

judgment insofar as it found that, at the time of the crash, Dale met the policy conditions and was entitled to recover.

With regard to the matter of attorney's fees and costs, we have a slightly different situation. The trial court allowed attorney's fees in the amount of $39,560 and costs in the amount of $15,453.14. In support of Dale's request for attorney's fees and costs, it filed various affidavits. The order of the court allowing these two items does not detail what was considered and what was disregarded. It is clear, however, that some items must have been disregarded because the amount claimed is not identical to the amount allowed.

With regard to the allowance of attorney's fees, Federal maintains that no such fees should be allowed because counsel for Dale was salaried in-house counsel and therefore Dale did not incur any expenses for attorneys in this case. We do not believe that the requirements of section 44-359, R. R. S. 1943, intend to disregard in-house counsel. Had counsel not been engaged in this case, he could have been otherwise engaged. Under the mandatory language of section 44-359, R. R. S. 1943, a successful litigant is entitled to receive a reasonable attorney's fee for in-house counsel actually engaged in the preparation and trial of the litigation to the same extent as outside counsel. We believe the mandatory language of section 44-359, R. R. S. 1943, entitled Dale to the allowance of an attorney's fee even for in-house counsel. We do not, however, agree as to the amount allowed nor do we believe that a fee for Mr. James Holmberg should be allowed after suit was filed. Dale acknowledges, as does the record reflect, that Mr. Holmberg served as both counsel and witness. In its brief, Dale notes, "Foremost was the absolute need for Mr. Holmberg to appear as one of plaintiff's key witnesses at trial." Section 44-359, R. R. S. 1943, does not contemplate the al-

lowance of expert witness fees to lawyers simply because they are members of the bar. Likewise, see Canon 5 of the Code of Professional Responsibility, and in particular, EC 5-9 and EC 5-10.

We have reviewed Dale's affidavit and conclude an attorney's fee in the amount of $18,075 is appropriate in this case.

Likewise, with regard to the costs allowable under section 25-1708, R. R. S. 1943, we believe the trial court erred in allowing certain of the costs. Again, we cannot determine which of the requested costs were allowed and which were disallowed. We have, however, examined the record in detail and conclude an allowance of $3,871.83 for costs is proper.

The order of the trial court is therefore modified to provide for the allowance of an attorney's fee in the amount of $18,075 and the allowance of costs in the amount of $3,871.83. In all other respects the judgment of the trial court is affirmed.

AFFIRMED AS MODIFIED.

BOSLAUGH, J., dissenting in part.

I dissent from that part of the opinion in this case which holds that the issues presented questions of fact rather than law and that the landing at Olathe, Kansas, was a part of a ferry flight.